## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANNA CLAIRE BATES AND JANE DOE** | } |
| | } |
| **Plaintiffs,** | } |
| | } |
| **v.** | }   **Case No.:  2:23-CV-01063-RDP** |
| | } |
| **SEQUEL YOUTH AND FAMILY** | } |
| **SERVICES, LLC, et al.,** | } |
| | } |
| **Defendants.** | } |

## MEMORANDUM OPINION

This matter is before the court on Defendants' Partial Motion to Dismiss the First Amended Complaint. (Doc. # 18). The Motion (Doc. # 18) has been fully briefed and is ripe for review. (Docs. # 18, 21, 22). For the reasons discussed below, the Motion (Doc. # 18) is due to be denied.

## I.      Factual Background[1]

Plaintiffs Anna Claire Bates and Jane Doe bring this suit on behalf of themselves and other similarly situated individuals based on claims of forced labor and abuse of teenagers who have emotional and behavioral issues and were housed at Sequel Youth and Family Services, LLC's facilities across the United States. The relevant factual allegations are set out below.

### A.      The Sequel Defendants

In 1999, Adam Shapiro and John Ripley founded Sequel Youth and Family Services, LLC ("Sequel"), an operation of boarding school facilities for teenagers with behavioral

---

[1] In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Found. Fin. Grp., LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008). Accordingly, the facts set out herein are taken from Plaintiffs' First Amended Complaint (Doc. # 15), and they are assumed true for purposes of ruling on Defendants' motion.

problems. (Doc. # 15 ¶¶ 1-3, 22-23, 114). Sequel operated over forty facilities in twenty-one different states until 2020. (*Id.* at ¶¶ 3, 22, 114). It had fifty companies within its corporate structure, and over 2,500 employees. (*Id.* at ¶ 22).

One of Sequel's companies was Sequel TSI Holdings, LLC ("TSI Holdings"), an Iowa limited liability company with its principal place of business in Huntsville, Alabama. (*Id.* at ¶¶ 29-30). TSI Holdings was the managing member of two other Sequel entities: Sequel TSI of Alabama, LLC ("TSI of Alabama") and Sequel TSI of Auldern, LLC ("TSI of Auldern"). (*Id.* at ¶ 31).

TSI of Alabama -- now doing business as Brighter Path Alabama, LLC -- was an Alabama limited liability company with its principal place of business in Montgomery, Alabama. (*Id.* at ¶ 32). At all times relevant, TSI of Alabama owned and operated residential facilities in the state of Alabama for at-risk youth, including Sequel Montgomery. (*Id.* at ¶ 33).

TSI of Auldern was a North Carolina limited liability company with its principal place of business in Huntsville, Alabama. (*Id.* at ¶ 34). At all times relevant, TSI of Auldern owned and operated Auldern Academy, a residential facility for teens with behavioral issues, in North Carolina. (*Id.* at ¶ 35).

### B.    Plaintiff Anna Claire Bates

Plaintiff Anna Claire Bates attended Auldern Academy, a "private therapeutic boarding school offering 8th through 12th-grade college preparatory education" for young girls, from April 2016 to June 2017. (Doc. # 15 ¶¶ 15, 42).

During Plaintiff Bates's enrollment at Auldern Academy, all students were required to participate in on-campus "community service." (*Id.* at ¶ 45). Specifically, the school's website stated "[o]n-campus service might find our students planting flowers or cleaning the school vans,

helping with the deep cleaning of various campus buildings or windows, and other chores." (*Id.*). However, Plaintiff Bates alleges that Auldern Academy required much more than just a few hours of "community service" and instead used the students in its care as free janitors and groundskeepers to cut operating costs. (*Id.*). Plaintiff Bates alleges that she and other students at Auldern Academy were forced to clean and maintain the entire campus. (*Id.* at ¶ 46). Indoor tasks included sweeping, mopping, and taking out the trash in buildings across campus. (*Id.* at ¶ 47). Typical outdoor tasks consisted of "weeding, laying out pine straw, moving rocks, and building hiking trails." (*Id.* at ¶ 48). But, some students reported being forced to participate in more strenuous outdoor chores, such as repairing properties, building cabins while ill, and lining paths with boulders for up to twelve hours at a time. (*Id.*).

Plaintiff Bates alleges that Auldern Academy ensured the students performed the labor by employing a variety of abusive measures if they refused to do the work. (*Id.* at ¶ 49). She witnessed staff members tackle, sit on, pull, and physically beat other students. (*Id.* at ¶ 50). One student was forced to carry boulders for up to twelve hours a day, forbidden from speaking to anyone, and required to sleep on the floor of the dorm lobby with the lights on. (*Id.* at ¶ 57). Other students had school credits removed from their transcripts, resulting in them having to remain at the Academy longer to make up a course or re-take a course at a different location. (*Id.* at ¶¶ 70-71).

Other methods of punishment were more egregious and lasted indefinitely. A student could be mandated to a period of "Refocus," which included "runn[ing] up a hill carrying rocks, sleep[ing] on the floor of the activities room with no blanket or pillow, eat[ing] only plain oatmeal and rice and beans which they had to cook over a fire, and walk[ing] six miles." (*Id.* at ¶ 54). Plaintiff Bates was placed on Refocus during her time at Auldern Academy, where she was

forced to limit her food intake and participate in strenuous physical activity, resulting in her nearly passing out. (*Id.* at ¶¶ 55-56). Another student was punished by having to participate in Refocus for twenty-five days, and was forced to perform manual labor, including walking up and down a hill with a backpack full of heavy rocks, and raking the forest. (*Id.* at ¶ 59). Months later, the same student was placed on Refocus again as a scare tactic "because the staff thought she would only continue behaving according to their instructions and expectations if she was afraid of Refocus." (*Id.*).

Students were also punished by being placed on "Non-com", during which they were forbidden from communicating or making eye contact with anyone other than therapists during weekly one-on-one therapy sessions. (*Id.* at ¶ 61). The time spent on Non-com varied from student to student, with some girls experiencing isolation for twenty-five days to over a month. (*Id.* at ¶¶ 64-65). Alternatively, a student could be placed on "5 Foot" or "2 Foot," during which she was under twenty-four-seven supervision and required to be within those distances from a staff member at all times, including when sleeping. (*Id.* at ¶ 67). As a result, the student was forced to move her mattress to the dorm's common room floor and sleep next to the staff person's desk each night. (*Id.*). This often resulted in a child going to sleep later than and waking up earlier than all other students. (*Id.*).

Out of fear of these punishments, Plaintiff Bates and other students at Auldern Academy participated in manual labor for no pay. (*Id.* at ¶¶ 43, 72-73).

### C.    Plaintiff Jane Doe

Plaintiff Jane Doe resided at Sequel Montgomery, a "Staff-Secure Residential facility that offered an intensive therapeutic long-term program," from December 2014 to the fall of 2015.

(Doc. # 15 ¶¶ 17, 83). Plaintiff Doe alleges that, during her enrollment at Sequel Montgomery, she and other children were forced to clean the campus without pay. (*Id.* at ¶¶ 84-90).

Similar to Plaintiff Bates, Plaintiff Doe alleges that Sequel Montgomery forced students to perform unpaid labor by threats and infliction of force, harm, disciplinary procedures, and physical restraints. (*Id.* at ¶¶ 93-95). One method of discipline included extending the length of a child's required placement at Sequel Montgomery if they failed to comply with staff orders, resulting in the child losing access to privileges, such as communicating with family. (*Id.* at ¶¶ 96-99). Another practice of punishment consisted of placing students on "GI", during which a student was forbidden from interacting with peers and had to remain at least ten feet away from other residents at all times. (*Id.* at ¶ 100). Similarly, students could be locked in a seclusion room the size of a small child's closet called "the Box" for extended periods of time and only checked on every few hours. (*Id.* at ¶ 102). Students in the Box had limited access to basic necessities, such as a restroom; as a result, Plaintiff Doe and other students placed in the Box were forced to urinate or defecate on themselves. (*Id.* at ¶¶ 102-104).

In addition to being forced to perform unpaid labor, Plaintiff Doe also alleges that she was repeatedly sexually abused by an adult male employee during her enrollment at Sequel Montgomery. (*Id.* at ¶¶ 195-197). Although she reported the sexual abuse to her therapist, the therapist did not report to the abuse to the police or any other appropriate notification channel. (*Id.* at ¶ 198). Later, Plaintiff Doe reported the sexual abuse to a female social worker employed at Sequel Montgomery; the same female social worker befriended and groomed Plaintiff Doe, before sexually abusing her as well. (*Id.* at ¶ 199-200).

**D.     Other Sequel Locations**

In addition to Auldern Academy and Sequel Montgomery, Sequel owned over forty other rehabilitation facilities in twenty-one states. (Doc. # 15 ¶¶ 114, 118). Plaintiffs allege that part of Sequel's business model was to maintain low operating expenditures by intentionally understaffing all of its facilities. (*Id.* at ¶ 181). For instance, John Ripley -- the co-founder of Sequel -- informed business students that "[y]ou can keep [sic] make money in this business if you control staffing[.]" (*Id.* at ¶ 182).

Plaintiffs allege that all of Sequel's facilities were understaffed, and, as a result, Sequel had standardized policies and procedures in place at all of its facilities to make the resident children perform manual labor without pay. (*Id.* at ¶¶ 129-130, 183). As evidence of this, they point to four other locations with allegations of forced labor. (*Id.* at ¶ 130).

Further, they allege that "Sequel facilities nationwide employed force, threats of force, physical restraint, and threats of physical restraint to force the children to acquiesce to their demands, expectations, and instructions, including those involving the children's labor." (*Id.* at ¶ 136). They point to numerous reports of physical, psychological, and emotional abuse from children housed at various Sequel facilities across the United States. (*Id.* at ¶¶ 137-166).

**E.     The Filing of this Action**

Plaintiffs Bates and Plaintiff Doe (collectively "Plaintiffs") filed the First Amended Complaint in this action on November 20, 2023. (Doc. # 15). The First Amended Complaint asserts both individual and class claims against Sequel, TSI Holdings, TSI of Alabama, and TSI of Auldern (collectively "Defendants"). Plaintiffs bring this action on behalf of themselves and the following "Class":

> All minors who were housed at one of the facilities owned, operated, or managed
> by Defendant Sequel Youth and Family Services, LLC, Defendant TSI Holdings,

LLC, Defendant Sequel TSI of Alabama, LLC, or Defendant Sequel TSI of Auldern, LLC and who provided labor or services without pay. The class includes only those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(*Id.* at ¶ 218).

In addition, Plaintiff Bates and Plaintiff Doe each assert claims on behalf of subclass members at their individual facilities. Plaintiff Bates bring claims on behalf of herself and the following "Auldern Subclass":

All minors who were held at Auldern Academy at 990 Glovers Grove Church Rd, Siler City, NC 27344 and who provided labor or services without pay. The Auldern Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(*Id.* at ¶ 219). Plaintiff Doe asserts claims on behalf of herself and the following "Sequel Montgomery Subclass":

All minors who were held at Sequel Montgomery, Alabama, and who provided labor or services without pay. The Sequel Montgomery Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(*Id.* at ¶ 220).

The First Amended Complaint asserts six federal causes of action: (1) Count I – Civil Action Under 18 U.S.C. § 1595(a) for Forced Labor Violation of 18 U.S.C. § 1589(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (2) Count II – Civil Action Under 18 U.S.C. § 1595(a) for Benefitting from the Forced Labor Violation of U.S.C. § 1589(a) against all Defendants on behalf of Plaintiffs and the Class; (3) Count III – Civil Action Under 18 U.S.C. § 1595(a) for Human Trafficking Violation of 18 U.S.C. § 1590(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (4) Count IV – Civil Action Under 18 U.S.C. § 1595(a) for Benefitting from the Human Trafficking Violation of

18 U.S.C. § 1590(a) against all Defendants on behalf of the Plaintiffs and the Class; (5) Count V – Civil Action Under 18 U.S.C. § 1595(a) for Attempted Forced Labor in Violation of 18 U.S.C. § 1594(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (6) Count VI – Civil Action Under 18 U.S.C. § 1595 for Conspiracy to Force Labor in Violation of 18 U.S.C. § 1594(b) against all Defendants on behalf of Plaintiffs and the Class. (*Id.* at ¶¶ 239-296).

In addition, Plaintiff Doe asserts the following state law causes of action individually against TSI of Alabama: (1) Count VII – Negligence and/or Wantonness; and (2) Count VIII – Negligence and/or Wantonness: Premises Liability. (*Id.* at ¶¶ 297-314).

Defendants filed a Partial Motion to Dismiss on December 8, 2023. (Doc. # 18). The Motion to Dismiss seeks dismissal of Counts I-V in part and Count VI in its entirety. (*Id.*).

## II.    Legal Standard

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

Complaints that tender "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

III.     **Discussion**

Plaintiffs allege that Defendants violated various sections of the Trafficking Victims

Protection Reauthorization Act ("TVPRA"). 18 U.S.C. §§ 1581-1597 (2022). Under Section

1589(a) of the TVPRA, it is illegal for an individual or corporation to provide or obtain the labor

or services of a person:

> (1) by means of force, threats of force, physical restraint, or threats of physical
> restraint to that person or another person; (2) by means of serious harm or threats
> of serious harm to that person or another person; (3) by means of the abuse or
> threatened abuse of law or legal process; or (4) by means of any scheme, plan, or
> pattern intended to cause the person to believe that, if that person did not perform
> such labor or services, that person or another person would suffer serious harm or
> physical restraint.

18 U.S.C. § 1589(a)(1-4). Similarly, Section 1590(a) states:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any
> means, any person for labor services in violation of this chapter shall be fined
> under this title or imprisoned not more than 20 years, or both. …

18 U.S.C. § 1590(a).

Although Sections 1589 and 1590 are criminal statutes, a victim is authorized to bring a

civil action to enforce either statute under Section 1595. It states:

> [a]n individual who is a victim of a violation may bring a civil action against the
> perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit,
> financially or by receiving anything of value from participation in a venture which
> that person knew or should have known has engaged in an act in violation of this
> chapter) in an appropriate district court of the United States and may recover
> damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). "The purpose of [S]ection 1595 is to provide a civil remedy for violation of

the federal peonage, slavery, and trafficking in persons statutes." *Baird v. Tech Providers, Inc.*,

2017 WL 1057637, at *3 (N.D. Ala. 2017) (citing *Dlamini v. Babb*, 2014 WL 5761118, at *4

(N.D. Ga. 2014)). In essence, Section 1595(a) creates two separate causes of action: one against

those who directly engaged in the violation of the TVPRA (a "direct-liability claim") and another

10

against those who knowingly benefitted from participating in a venture that they knew or should have known violated the TVPRA (a "beneficiary-liability claim").

Plaintiffs bring both direct-liability and beneficiary-liability claims in this matter. Counts I, III, and V assert direct-liability claims against TSI of Auldern and TSI of Alabama for forced labor, human trafficking, and attempted forced labor. (Doc. # 15 at 52, 60, 67).  And, Counts II and IV assert beneficiary-liability claims against all Defendants. (*Id.* at 55, 62). Finally, Count VI asserts a conspiracy claim against all Defendants. (*Id.* at 68).

Defendants seek dismissal of Counts I through V of the First Amended Complaint in part and Count VI in entirety for five reasons. (*See* Doc. # 18 at 2-3). First, Defendants claim that Plaintiffs have failed to plausibly allege that a violation of the TVPRA took place at any other facility. (*Id.* at 2). Second, Defendants argue that Counts II and IV are due to be dismissed against Sequel and TSI Holdings because the First Amended Complaint does not plausibly allege that either entity knew or should have known about the TVPRA violations. (*Id.* at 3). Third, Defendants contend that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama to the extent they make claims as to facilities outside of Auldern Academy and Sequel Montgomery. (*Id.*). Fourth, Defendants argue that all of Plaintiffs' claims relating to conduct at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure are due to be dismissed. (*Id.*). And, finally, Defendants contend that Count VI is due to be dismissed in entirety because Plaintiffs have not plausibly alleged that Defendants entered into a conspiracy. (*Id.*). The court examines each argument, in turn.

### A. The First Amended Complaint plausibly alleges that violations of the TVPRA occurred at other facilities owned by Sequel and TSI Holdings.

First, Defendants argue that any allegations against facilities other than Auldern Academy and Sequel Montgomery are due to be dismissed because Plaintiffs have failed to

allege that a forced labor violation of the TVPRA occurred at any other facility. "[T]o state a claim [for forced labor] under § 1589(a), a plaintiff must adequately plead that the defendant (1) provided or obtained the labor or services of plaintiff (2) 'by means of' one of the enumerated means, and (3) did so 'knowingly.' *Hubbard v. Crow*, 2023 WL 10366527, at \*11 (W.D. Tex. 2023) (citing *United States v. Toure*, 965 F.3d 393, 400 (5th Cir. 2020)).

Defendants do not dispute that the First Amended Complaint clearly states a claim under Sections 1589(a) and 1590(a) for forced labor at both Auldern Academy and Sequel Montgomery. Indeed, Plaintiffs have alleged numerous examples of labor that students were required to perform around both facilities and describes a myriad of different punishments that both schools employed when students refused to participate in the labor. (*See* Doc. # 15 ¶¶ 42-111). But, Defendants argue that the First Amended Complaint does not plausibly allege that violations of the TVPRA occurred at any other facility owned by Sequel. The court disagrees.

Plaintiffs have pled enough information to support a reasonable inference that violations of the TVPRA occurred at other facilities as well. *Iqbal*, 556 U.S. at 678. The First Amended Complaint states that "Sequel facilities nationwide employed force, threats of force, physical restraint, and threats of physical restraint to force the children to acquiesce to their demands, expectations, and instructions, including those involving the children's labor." (Doc. # 15 ¶ 136). In support of this, Plaintiffs contend that Sequel had standardized policies and procedures in place across all of its facilities, including disciplinary policies and procedures. (*Id.* at ¶ 131). Further, Plaintiffs cite to at least four students who allege they were forced to work without pay at other schools owned by Sequel (*id.* at ¶ 130), as well as over 20 documented instances of abuse at facilities across the nation. (*Id.* at ¶¶ 133-161).

Defendants direct the court to *Flores v. Starwood Hotels & Resorts Worldwide, Inc.* in support of their argument that Plaintiffs have failed to state a TVPRA claim for conduct at Sequel's other facilities. 2015 WL 12912337 (C.D. Cal. 2015). There, a plaintiff filed suit alleging minimum wage violations against his employer on behalf of himself and any other employees who had worked at either his facility or another of the employer's facilities within the state of California. *Id.* at *2. The defendants sought dismissal of the class claims on the basis that the plaintiff had failed to point to violations at any location other than the one where he was employed. *Id.* at *3. The *Flores* court agreed. In doing so, the *Flores* court found it particularly relevant that the plaintiff's complaint did not demonstrate any knowledge or reasonable beliefs of the employment practices or policies at the plaintiff's own work site, let alone at one of the defendant's other work sites across the state. *Id.* at *4.

The *Flores* court relied on *Mendez v. H.J. Heinz Co.*, another employment case from that court. 2012 WL 12888526 (C.D. Cal. 2012). Like in *Flores*, the *Mendez* plaintiff brought claims against his employer on behalf of himself, as well as both a statewide and nationwide class. *Id.* at *1. The *Mendez* court concluded that dismissal of the class claims was appropriate because the plaintiff "allege[d] no facts to demonstrate or suggest that any member of the putative class, in California or nationwide, had similar work experiences…" to him. *Id.* at *4. Further, the court noted the fact that the plaintiff's allegations, at most, showed that the employer's policies were implemented on only a factory-wide basis and they had not plausibly suggested that the policies were implemented at every factory in the country, or even the state. *Id.*

But, the pleadings here go well beyond those in *Flores* and *Mendez*. Unlike the plaintiffs in *Flores* and *Mendez* (who did not plausibly suggest that their employers implemented the same policies and procedure across all locations), Plaintiffs allege that Sequel had standard policies in

place at all of its facilities nationwide, including disciplinary policies and practices for the use of physical restraints when students did not follow commands. (Doc. # 15 ¶¶ 131-32, 161). Further, in contrast to the plaintiff in *Mendez* who did not point to any putative class members with similar experiences as him, the First Amended Complaint identifies numerous students at different locations who contend they were forced to perform labor and subject to abusive practices. (*Id.* at ¶¶ 130, 137-160).[2]

Whether Plaintiffs can actually prove that violations of the TVPRA occurred at each of these facilities remains to be seen. But, that is a question for another day. At this stage of the litigation, a plaintiff must only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556. Plaintiffs' allegations that Sequel had uniform policies and procedures in place at all facilities to force children to engage in unpaid labor have done just that. Therefore, Defendants' argument that the First Amended Complaint fails to plausibly allege a violation of the TVPRA at any other facility is due to be denied.

**B.    Counts II and IV are not due to be dismissed.**

Counts II and IV assert beneficiary-liability claims against all Defendants, alleging that they knowingly benefitted from a venture that they knew or should have known violated Sections 1589 and 1590(a). Defendants contend that the beneficiary-liability claims in Counts II and IV should be dismissed against Sequel and TSI Holdings because Plaintiffs have not plausibly alleged that either Defendant knew or should have known of the alleged TVPRA allegations at

---

[2] Defendants spend a portion of their brief correctly noting that the TVPRA does not provide a cause of action for abuse only, but instead only for "obtain[ing] … labor or services by means of serious harm or threats of serious harm." (Doc. # 18 at 8). Thus, they argue that, although the Complaint points to numerous instances of abuse at various facilities (*see* Doc. # 15 ¶¶ 136-160), these instances fail to state a claim for a TVPRA violation at these facilities because they do not allege that the abuse was used to force labor. That argument misses the target. The Complaint clearly alleges that residents in those facilities were so fearful of the punishments and threats of punishment that they acquiesced to instructions to perform labor. (*See id.* at ¶¶ 166, 246).

the individual facilities. In addition, Defendants also argue that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama because neither facility knew or should have known that forced labor violations were occurring at any of Sequel's other facilities. The court analyzes each argument, in turn.

### 1.   Counts II and IV are not due to be dismissed against Sequel and TSI Holdings.

To state a beneficiary-liability claim under Section 1595, a plaintiff must allege that a defendant: (1) knowingly benefitted; (2) from participating in a venture; (3) that venture violated the TVPRA; and (4) the defendant knew or should have known that the venture violated the TVPRA. *Red Roof Inns, Inc.*, 21 F.4th at 723. Defendants argue that the beneficiary-liability claims in Counts II and IV should be dismissed against Sequel and TSI Holdings because the First Amended Complaint does not plausibly allege the fourth element – that either Sequel or TSI Holdings knew or should have known that the other Defendants violated the TVPRA.

The Eleventh Circuit has made clear that a defendant may be held liable under the TVPRA if it has either actual or constructive knowledge that the venture in which it participated and from which it benefitted violated the TVPRA. *Id.* at 725. "Actual knowledge requires '[a]n awareness or understanding of a fact or circumstance.'" *Id.* (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). On the other hand, constructive knowledge is "that knowledge which 'one using reasonable care or diligence should have.'" *Id.* (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). Thus, to state a claim under the TVPRA, Plaintiffs must plausibly allege that Sequel and TSI Holdings had (at least) constructive knowledge that the venture in which they participated and from which they benefited violated the TVPRA as to Plaintiffs. *See J.C. v. I Shiri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1319 (N.D. Ga. 2022).

Dismissal of a Section 1595 claim is appropriate when a plaintiff offers "no instances that would have prompted a reasonable person or company to be aware of or even suspect" the possibility of a TVPRA violation. *See Cassone v. Austin Chronicle Corp.*, 2024 WL 2031713, at *9 (W.D. Tex. May 7, 2024) (finding that a complaint failed to meet the requisite constructive knowledge requirement because the complaint did not directly plead that the defendant should have known of the venture). But, courts within this circuit have found that constructive knowledge was properly pled even if a complaint cited only to "red flags" that supported open signs of a TVPRA violation. *See A.D. v. Choice Hotels Int., Inc.*, 2023 WL 5510090, at *5 (M.D. Fla. 2023) (finding that "red flags" at a hotel including payments in cash, requests for sheet changes, and the victim's physical appearance should have made employees and staff aware of a TVPRA trafficking violation); *A.D. v. Best Western Int., Inc.*, 2023 WL 5510064, at *5 (M.D. Fla. 2023) (same). Thus, "an overt or direct act" that would put the defendant on notice of a TVPRA violation is not required to meet the knowledge requirement. *Best Western Int., Inc.*, 2023 WL 5510064, at *5.

After careful review, the court finds that Plaintiffs have stated enough facts to plausibly allege that Sequel and TSI Holdings had at least constructive knowledge that its facilities were violating the TVPRA. The First Amended Complaint alleges that "Defendant Sequel intentionally maintained 'low operating expenditures' by consistently understaffing all of its facilities." (Doc. # 15 ¶ 181). In support of this, Plaintiffs point to the quote from John Ripley, the co-founder of Sequel, informing business students that "[y]ou can … make money in this business if you control staffing." (*Id.* at ¶ 182). To be sure, as Defendants' note in their brief (Doc. # 18 at 9), a company-wide plan to limit the number of staff to conserve revenue is not tantamount to an admission of forced labor. But, Plaintiffs' pleading emphasis on controlling

staffing, combined with the allegations made in the First Amended Complaint about the tasks students were required to perform, raises a plausible inference that Sequel and TSI Holdings had to be aware that necessary maintenance at each camp was being improperly provided by students, not maintenance staff.

Further, the First Amended Complaint alleges that Sequel and TSI Holdings had the same corporate leadership who exercised "rigorous oversight and control" of the individual facilities. (Doc. # 15 ¶¶ 176, 186, 189, 192). These corporate leaders "continuously evaluate[d] [the] programs" and were involved at the facility level in employee termination, policy and process changes, and staff-wide training (*Id.* at ¶¶ 176, 189-192). Plaintiffs also point to numerous instances where these corporate leaders were notified of "red flags" at various facilities, such as severe understaffing and abusive practices. (*Id.* at ¶¶ 183-185, 188).

"Knowledge and other conditions of a person's mind may be alleged generally." *S.Y. v. Marriott Int., Inc.*, 2021 WL 2003103, at *5 (M.D. Fla. 2021) (citing Fed. R. Civ. P. 9(b) and *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018)). Here, the First Amended Complaint sufficiently alleges facts that, when assumed true, should have made Sequel and TSI Holdings generally aware of violations of the TVPRA. As discussed earlier, this is not to say that Plaintiffs will ultimately prevail on their claims against these two Defendants. But, because the First Amended Complaint "succeeds in 'identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible,'" it survives the motion to dismiss. *Watts*, 495 F.3d at 1296 (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). The court finds that the allegations of the First Amended Complaint are sufficient to raise a plausible inference that Sequel and TSI Holdings should have been aware of students impermissibly being forced to perform labor at their facilities.

      **2.**      **Counts II and IV are not due to be dismissed against TSI of Auldern and TSI of Alabama.**

Defendants also argue that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama because the pleadings do not adequately allege that those at either facility knew or should have known that forced labor violations were occurring at any of Sequel's other facilities. But, this argument is flawed: it incorrectly hinges the "knowledge" requirement on the wrong prong of the beneficiary-claim analysis. As the Eleventh Circuit has made clear, to assert that a defendant *knowingly* benefitted from a venture a plaintiff only must allege that "the defendant knew it was receiving some value from participating in an alleged venture" – not that it knew others were *also* participating in the venture. *Id.* And, a complaint alleges that a defendant participated in a venture if it alleges that it "took part in a common undertaking or enterprise involving risk and potential profit." *Id.* at 725.

Here, the First Amended Complaint alleges the following: (1) all Defendants were in a venture to provide shelter, education services, and other care to minors with behavioral, emotional, and physical issues (Doc. # 15 ¶ 112); (2) Sequel and TSI Holdings had a venture-wide scheme to control costs by limiting the number of staff members employed (*id.* at ¶ 264); and (3) TSI of Auldern and TSI of Alabama participated in this scheme and increased profits by not paying for adequate staff but instead improperly obtaining the labor services of children at their facilities via force or threats (*id.* at ¶¶ 262, 264). These allegations, when assumed to be true (as they must be at this stage), plausibly allege that TSI of Auldern and TSI of Alabama took part in a common undertaking or enterprise of forcing students to perform free labor instead of hiring staff and were aware that they were receiving value from it in the form of increased profits. It is not necessary that they knew other Sequel locations were doing the same. Thus, the requisite

knowledge component for pleading beneficiary-liability claims under Sections 1589 and 1590(a) is met here.

### C. The First Amended Complaint plausibly alleges TVPRA violations occurred at Sequel Montgomery prior to Plaintiff Doe's arrival and after her departure.

Defendants also seek dismissal of any claims about their alleged conduct that occurred at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure. Defendants contend that Plaintiff Doe "asserts claims for Defendants' alleged violations of the TVPRA for the 17-year span dating from approximately 2007 to the present" but "does not sufficiently allege that the allegedly illegal conduct began prior to [her] arrival or extended beyond her departure from the Montgomery facility." (Doc. # 18 at 10).

As noted previously, Plaintiff Doe asserts claims on behalf of the following Sequel Montgomery Subclass:

> All minors who were held at Sequel Montgomery, Alabama, and who provided labor or services without pay. The Sequel Montgomery Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(Doc. # 15 ¶ 220). As an initial matter, any limitation of the subclass is premature at this stage of the litigation. "Outside of inherently subjective and indeterminate class definitions, striking a class claim before a motion for certification (and before the benefit of pre-certification discovery) is rare." *Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 627 (N.D. Ala. 2013). Instead, a class or subclass definition in a complaint is a working definition that may be altered or limited as the pre-certification process -- which is affected by a number of matters, including discovery -- reveals more information that "sheds light on the contours of the potential class." *Id.* (citing 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1785.4 n.1 (3d ed) ("In making a determination of

whether an action may proceed as a class action, the court necessarily must pass on the appropriateness of the class proposed by plaintiff … [the class] definition may be relevant to future discovery and to trial preparation, but it remains subject to change before the decision on the merits and does not establish the class will be bound by the judgment.")).

In any event, the court finds that the First Amended Complaint *does* sufficiently allege that TVPRA violations occurred both prior to Plaintiff Doe's arrival at Montgomery Sequel and after her departure from the facility. Although the existence of class claims in this case affects the standard a court applies in evaluating a motion to dismiss, it does not fundamentally change the nature of the inquiry. Instead, "[a]s long as the class allegations make it plausible that discovery will lead to facts that would justify certifying a class action, the court will not dismiss the class claims." *Wallace v. VF Jeanswear Ltd. P'ship*, 2020 WL 999341, at *5 (N.D. Ala. 2020) (citing *Faught v. Am. Home Shield Corp.*, 2007 WL 9657811, at *1 (N.D. Ala. 2007)). Here, the allegations do just that.

Plaintiff Doe alleges that the cleaning requirements at Sequel Montgomery were not newly implemented when she arrived, but instead had already been in place before she was placed there. (Doc. # 15 ¶ 92). Further, she contends that the punishment methods used to force students to perform labor were used throughout her enrollment, and those same methods were also highlighted as still being used in a report that was released about the school five years after she had left. (*Id.* at ¶ 105). These allegations, when assumed to be true, raise at least an inference that discovery will reveal other students were forced to perform labor before, during, and after Plaintiff Doe's time at Sequel Montgomery.

Therefore, Defendants' argument that any claims relating to conduct that occurred at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure are due to be dismissed fails, and the Motion to Dismiss is due to be denied as to this claim.

> **D.    Plaintiffs have plausibly alleged that Defendants entered into a conspiracy.**

In Count VI, Plaintiffs bring a civil action under 18 U.S.C. § 1595 for Conspiracy to Force Labor in Violation of 18 U.S.C. § 1594(b). (Doc. # 15 at 68). Under Section 1594(b), "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section." 18 U.S.C. § 1594(b). For there to be a conspiracy under this statute, there must be an agreement to violate the prohibition on forced labor. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D. N.Y. 2017) (citing *United States v. Svoboda*, 347 F.3d 471, 476-77 (2d Cir. 2003)).

To plead a conspiracy claim, it is not necessary to allege that each Defendant knew of every essential detail or participated in every stage of the conspiracy; instead, Plaintiffs must only plead that Defendants "knew of the conspiratorial goal and that [they] voluntarily participated in helping to accomplish that goal." *United States v. Brown*, 872 F.2d 385, 390 (11th Cir. 1989) (quoting *United States v. Lee*, 695 F.2d 515 (11th Cir. 1983), *cert. denied*, 464 U.S. 839, 104 S. Ct. 130, 78 L. Ed. 2d 125 (1983) (internal citations omitted)).

It is the rare case that contains direct evidence of a conspiracy. Instead, "[w]hile mere presence or association with other persons involved in a criminal enterprise is not sufficient to prove participation in a conspiracy … the essential elements of a conspiracy can be proven by inference from the actions of the actors or by circumstantial evidence." *United States v. Gianni*,

678 F.2d 956, 959 (11th Cir. 1982) (citing *United States v. Conway*, 632 F.2d 641, 643 (5th Cir. 1980)).[3]

Defendants assert that the First Amended Complaint is void of facts suggesting the existence of a conspiracy. And, they spend a portion of their brief arguing the fact allegations here only suggest parallel conduct at various facilities. (Doc. # 18 at 14). In support of this argument, they rely on the Eleventh Circuit's ruling in *American Dental Ass'n v. Cigna Corp*. 605 F.3d 1283, 1294-95 (11th Cir. 2010). There, the plaintiffs alleged that a conspiracy could be inferred between multiple insurance companies because each engaged in the same conduct, including the collective use and development of an automated process to manipulate coding software and the use of the same claims submission procedure. *Id.* at 1294. The court of appeals disagreed, holding that under *Twombly* "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy." *Id.* (citing *Twombly*, 550 U.S. at 557). The court made clear that "when allegations of parallel conduct are set out … they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* (citing *Twombly*, 550 U.S. at 557).

But here, Plaintiffs have pointed to more than just mere parallel conduct at various facilities. Plaintiffs' allegations include the following: that individuals in leadership roles at Sequel and TSI Holdings had a goal of keeping staff levels low by avoiding hiring adequate janitorial and groundskeeping staff (Doc. # 15 ¶ 293); that Sequel and TSI Holdings maintained oversight and control at the individual Sequel facilities to ensure that each facility complied with its policies, practices and procedures (*id.* at ¶ 293-295); that these policies and procedures

---

[3] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

included use of physical restraints and force to coerce the residents to provide unpaid labor (*id.*); and that Auldern Academy and Sequel Montgomery voluntarily joined and engaged in this effort by operating facilities that were understaffed, requiring the students to perform unpaid labor, and imposing abusive punitive measures for students who did not comply (*id.* at ¶ 295).

When viewing these allegations in the light most favorable to Plaintiffs, and assuming their veracity, the court finds them sufficient to allege that all Defendants were aware of "the conspiratorial goal" and "voluntarily participated in helping to accomplish" it. *Brown*, 872 F.2d at 390. And, because Plaintiffs contend that it was Sequel's company-wide scheme to cut costs by retaining low levels of staff, they have sufficiently alleged that the forced labor at various facilities was more than just mere random parallel conduct, but instead each facility's concentrated decision to comply with the scheme.

Finally, Defendants argue that, even if the First Amended Complaint plausibly alleges a claim of conspiracy, that claim is nonetheless barred by the intracorporate conspiracy doctrine. (Doc. # 18 at 14-15). This doctrine was aptly summarized in *McAndrew v. Lockheed Martin Corp.*:

> The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under this doctrine, a corporation can conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

206 F.3d 1031, 1036 (11th Cir. 2000).

But, as Plaintiffs note, an important exception to this doctrine exists: "the intracorporate conspiracy doctrine cannot shield corporate employees and corporations accused of criminal conspiracies." *Id.* at 1039. This remains true even when, like here, a plaintiff asserts a civil claim that seeks recovery from a criminal conspiracy. *Id.* at 1041 ("[W]e conclude that the criminal

conspiracy exception to the intracorporate conspiracy doctrine applies regardless of whether the criminal conspiracy arises under 18 U.S.C. § 371 or 42 U.S.C. § 1985. Because [the claim] … necessarily alleges a criminal conspiracy, the intracorporate conspiracy doctrine cannot apply."). Thus, because the claim here accuses Defendants of a conspiracy under the criminal code, the intracorporate conspiracy doctrine is inapplicable, and this argument is without merit. *See* 18 U.S.C. §§ 1595, 1594(b).

Therefore, the court finds that Count VI of the First Amended Complaint plausibly alleges that Defendants engaged in a conspiracy. As a result, Defendants' motion to dismiss Count VI is due to be denied.

## IV.    Conclusion

After careful review, Defendants' Partial Motion to Dismiss the First Amended Complaint (Doc. # 18) is due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this July 3, 2024.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE